**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

EPIC Technologies, Inc.,

        Plaintiff,

v.

Freescale Semiconductor, Inc.,

        Defendant.

Civil Action No. 1:08-cv-10447-NG

**FREESCALE SEMICONDUCTOR, INC.'S ANSWER**
**TO EPIC TECHNOLOGIES, INC.'S COMPLAINT**

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, and subject to Freescale's First Defense stated herein, Defendant Freescale Semiconductor, Inc. ("Freescale") answers the Complaint filed by EPIC Technologies, Inc. ("EPIC"), and states as follows:

**INTRODUCTION**

1.     Freescale denies any wrongdoing in its dealings with EPIC. Freescale admits that, as part of EPIC's effort to convince Freescale to license or acquire its technology for packaging semiconductors, EPIC provided certain information to Freescale at various times over the last several years and the parties entered into purchase order agreements and confidentiality agreements, the terms of which speak for themselves. Freescale also admits that it has its own semiconductor packaging development program called "Redistributed Chip Packaging" or "RCP." Freescale admits that certain members of the RCP team were, on two occasions, asked to evaluate certain aspects of EPIC's technology to assist in determining whether Freescale had an interest in discussing the possibility of licensing or acquiring the technology to supplement its RCP program. Freescale also admits that, at one point, there was information on Freescale's

website that described some of these same Freescale employees as RCP "Innovators" and described Marc Mangrum as the RCP "Concept Originator." Freescale admits that Mangrum is the Freescale employee who dealt most closely with EPIC and that Mangrum informed EPIC that he was in support of discussing the possibility of obtaining a license from EPIC, but that there was resistance within Freescale management and that final decision making authority rested with others. Freescale otherwise denies the averments in paragraph 1 of the Complaint.

2.      Freescale admits that it made public statements concerning its RCP program in July 2006 and years earlier, the substance of which speaks for itself. Freescale otherwise denies the averments in paragraph 2 of the Complaint.

3.      Freescale admits that James Kohl purports to be a founder and CEO of EPIC. Freescale also admits that Charles Eichelberger purports to be a founder and the Vice President of Technology of EPIC and that Eichelberger has been granted patents in the semiconductor field. Freescale otherwise is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 3 of the Complaint, and Freescale therefore denies such averments.

4.      Freescale admits that, by 1996, EPIC filed a patent application for what it calls its ChipsFirst technology and that, by no later than November 24, 1998, this technology was disclosed to the public when the United States Patent and Trademark Office granted EPIC U.S. Patent No. 5,841,193, entitled "Single Chip Modules, Repairable Multichip Modules, and Methods of Fabrication Thereof" which patent is attached as Exhibit A to the Complaint. Freescale admits that this technology takes up less space than conventional semiconductor packaging technologies and is capable of working with both single and multiple integrated circuit chips. Freescale otherwise denies the averments in paragraph 4 of the Complaint.

5.      Freescale admits that, beginning on or before 2001, EPIC embarked on a long-term effort to license its technology to Motorola and Motorola's successor Freescale.  Freescale also admits that, at various times over the next six years, the parties exchanged information with each other and entered into purchase order agreements and confidentiality agreements, the terms of which speak for themselves.  Freescale otherwise denies the averments in paragraph 5 of the Complaint to the extent the allegations are deemed factual.  To the extent paragraph 5 of the Complaint contains legal conclusions, no response is required.

6.      Freescale admits that, in addition to purchase order agreements, the following five agreements have been executed since 2001:  (a) Confidentiality Agreement dated April 9, 2001 (hereinafter the "Tempe NDA");  (b) Non-Disclosure Agreement dated April 13, 2001 (hereinafter the "Austin NDA");  (c) Mutual Non-Disclosure Agreement dated October 22, 2004 (hereinafter the "Freescale NDA");  (d) Technology Evaluation and Design Development Agreement dated March 21, 2005;  and (e) Non-Disclosure Agreement dated May 15, 2007 (hereinafter the "Woburn NDA").  Freescale also admits that copies of these five agreements appear to be attached to the Complaint as Exhibits B-F.  Freescale otherwise denies the averments in paragraph 6 of the Complaint.

7.      Freescale admits that Freescale knew it had only certain license rights from EPIC with respect to EPIC's technology and that it made written and oral communications consistent with that knowledge, the substance of which speaks for itself.  Freescale also admits that EPIC provided Freescale with certain information and the parties entered into purchase order agreements and confidentiality agreements, the terms of which speak for themselves.  Freescale otherwise denies the averments in paragraph 7 of the Complaint to the extent the allegations are

deemed factual.  To the extent paragraph 7 of the Complaint contains legal conclusions, no response is required.

8.    Freescale admits that some Freescale employees have shown interest in EPIC's technology at various times in the past, and over the last few years EPIC and Freescale have engaged in discussions concerning the possibility of Freescale licensing or acquiring EPIC's technology.  Freescale also admits that, in order to facilitate these discussions, the parties have exchanged information with each other.  Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 8 of the Complaint concerning EPIC's motivation or basis for its disclosures to Freescale, and Freescale therefore denies such averments.  Freescale otherwise denies the averments in paragraph 8 of the Complaint.

## THE PARTIES

9.    Freescale admits that EPIC purports to be a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business at 500 West Cummings Park, Suite 6950, Woburn, Massachusetts.  Freescale also admits that EPIC purports to be a semiconductor company that discovers and develops technology for packaging semiconductor chips.  Freescale otherwise is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 9 of the Complaint, and Freescale therefore denies such averments.

10.    Freescale admits that Freescale is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 6501 William Cannon Drive West, Austin, Texas.  Freescale admits Freescale's business was formerly the semiconductor division of Motorola and that Freescale was incorporated as a subsidiary of Motorola before becoming an independent, publicly traded company in December 2004.  Freescale also admits

that, in its previous form as a division of Motorola and in its current form as an independent company, Freescale has long been one of the largest semiconductor companies in the world. Freescale further admits that, in December 2006, Freescale was acquired by a consortium of private equity funds for $17.6 billion. Freescale otherwise denies the averments in paragraph 10 of the Complaint.

## JURISDICTION AND VENUE

11.     Paragraph 11 of the Complaint contains legal conclusions, to which no response is required.

12.     Paragraph 12 of the Complaint contains legal conclusions, to which no response is required. Freescale otherwise denies the averments in paragraph 12 of the Complaint.

13.     Freescale admits that it does business in this district through agents and representatives and otherwise has contacts with Massachusetts. Freescale also admits that it is registered to do business in the Commonwealth of Massachusetts and has an office in the state. Freescale otherwise denies the allegations in paragraph 13 of the Complaint to the extent the allegations are deemed factual. To the extent paragraph 13 of the Complaint contains legal conclusions, no response is required.

## STATEMENT OF FACTS

14.     Freescale admits that this dispute involves technology in the field of electronic packaging and interconnect (i.e., electrical connectivity) of semiconductors. Freescale otherwise denies the averments in paragraph 14 of the Complaint.

15.     Freescale admits the averments in paragraph 15 of the Complaint.

16.     Freescale admits the averments in paragraph 16 of the Complaint.

17.    Freescale admits that one approach to semiconductor packaging is MultiChip Module ("MCM") technology and that "chips last" MCM and "chips first" MCM are two forms of this approach.  Freescale otherwise denies the averments in paragraph 17 of the Complaint.

18.    Freescale admits the averments in paragraph 18 of the Complaint.

19.    Freescale admits the existence of the '193 patent.  Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 19 of the Complaint concerning what the so-called ChipFirst technology enables EPIC to do, and Freescale therefore denies such averments.  Freescale otherwise denies the averments in paragraph 19 of the Complaint to the extent the allegations are deemed factual.  To the extent paragraph 19 of the Complaint contains legal conclusions, no response is required.

20.    Freescale admits that, on or about January 29, 2001, EPIC representatives, Kohl and Phillips, made a presentation to Freescale employees, including Beth Keser, which related to the technology EPIC calls its ChipsFirst technology and which did not purport to be covered by any confidentiality agreement at the time.  Freescale also admits that, Kohl purports to be EPIC's CEO and Phillips purports to be EPIC's Vice President of Sales and Marketing. Freescale otherwise denies the averments in paragraph 20 of the Complaint.

21.    Freescale admits the averments in paragraph 21 of the Complaint.

22.    Freescale admits that, after EPIC made its licensing pitch for what EPIC calls its ChipsFirst technology, Mangrum was interested in evaluating the technology.  Freescale also admits that, at various times over the course of several years, EPIC provided Motorola and Freescale with certain information and the parties entered into purchase order agreements and confidentiality agreements, the terms of which speak for themselves.  Freescale further admits that Mangrum informed EPIC that he was in support of discussing the possibility of obtaining a

license from EPIC, but that there was resistance within Freescale management and that final decision making authority rested with others.  Freescale otherwise denies the averments in paragraph 22 of the Complaint to the extent the allegations are deemed factual.  To the extent paragraph 22 of the Complaint contains legal conclusions, no response is required.

23.    Freescale admits that, over the course of several years, Freescale/ Motorola and EPIC entered into purchase order agreements and other written agreements, the terms of which speak for themselves.  Freescale otherwise denies the averments in paragraph 23 of the Complaint to the extent the allegations are deemed factual.  To the extent paragraph 23 of the Complaint contains legal conclusions, no response is required.

24.    Freescale admits that, on April 9, 2001 more than 2 months after EPIC's meeting with Motorola in Tempe, Arizona, Motorola executed the non-disclosure agreement referred to as the "Tempe NDA", the terms of which speak for themselves.  Freescale otherwise denies the averments in paragraph 24 of the Complaint to the extent the allegations are deemed factual.  To the extent paragraph 24 of the Complaint contains legal conclusions, no response is required.

25.    Freescale admits that what is referred to as the "Austin NDA" is dated April 13, 2001.  Freescale also admits that Mangrum signed the Austin NDA, the terms of which speak for themselves.  Freescale otherwise denies the averments in paragraph 25 of the Complaint to the extent the allegations are deemed factual.  To the extent paragraph 25 of the Complaint contains legal conclusions, no response is required.

26.    Freescale admits that, in October 2004 and May 2007, the parties entered into the so-called "Freescale NDA" and "Woburn NDA" respectively, the terms of which speak for themselves.  Freescale otherwise denies the averments in paragraph 26 of the Complaint to the

extent the allegations are deemed factual. To the extent paragraph 26 of the Complaint contains legal conclusions, no response is required.

27.    Freescale admits that, in March 2005, EPIC and Freescale entered into the Technology Evaluation and Design Development Agreement, the terms of which speak for themselves. Freescale otherwise denies the averments in paragraph 27 of the Complaint to the extent the allegations are deemed factual. To the extent paragraph 27 of the Complaint contains legal conclusions, no response is required.

28.    Freescale admits the existence of the Technology Evaluation and Design Development Agreement, the terms of which speak for themselves. Freescale otherwise denies the averments in paragraph 28 of the Complaint to the extent the allegations are deemed factual. To the extent paragraph 28 of the Complaint contains legal conclusions, no response is required.

29.    Freescale admits the existence of the Technology Evaluation and Design Development Agreement, the terms of which speak for themselves. Freescale otherwise denies the averments in paragraph 29 of the Complaint to the extent the allegations are deemed factual. To the extent paragraph 29 of the Complaint contains legal conclusions, no response is required.

30.    Freescale admits that, over the last several years, Freescale/Motorola and EPIC have entered into purchase order agreements and confidentiality agreements, the terms of which speak for themselves. Freescale also admits that, Mangrum informed EPIC that he was in support of discussing the possibility of obtaining a license from EPIC, but that there was resistance within Freescale management and that final decision making authority rested with others. Freescale admits that, in attempting to convince Freescale to license its publicly patented technology, EPIC provided Freescale and Motorola with information at various times over the course of several years. Freescale admits that EPIC responded to questions from Freescale

engineers and provided Freescale with certain information, some or all of which was public at the time.  Freescale admits that, on at least 3 occasions (i.e. in June 2001, April 2004, and August 2006), EPIC invited employees of Freescale or Motorola, including Mangrum, to visit EPIC's facilities in Woburn.  Freescale otherwise denies the averments in paragraph 30 of the Complaint to the extent the allegations are deemed factual.  To the extent paragraph 30 of the Complaint contains legal conclusions, no response is required.

31.     Freescale admits the averments in paragraph 31 of the Complaint, with the clarification that the Micron "Flash" memory that EPIC used was supplied by Freescale.

32.     Freescale admits that the "system-in-a-package" concept involves placing many of the components necessary for an operational electronic device into a single package. Freescale admits that, in 2001, Mangrum requested that EPIC pursue the system-in-a-package concept in order to demonstrate the capability of EPIC's technology.  Freescale otherwise denies the averments in paragraph 32 of the Complaint.

33.     Freescale admits that EPIC employees exchanged emails with Motorola employees, the substance of which speaks for itself.  Freescale otherwise denies the averments in paragraph 33 of the Complaint.

34.     Freescale admits that EPIC prepared a presentation related to a "cell-phone-in-a-package," which is one application of the system-in-a-package concept.  Freescale admits that a "cell-phone-in-a-package" involves incorporating many of the necessary ICs for an operational cell pone into a single package the size of a postage stamp.  Freescale also admits that EPIC employees had telephone conversations with Freescale employees concerning the relevant technology and EPIC employees exchanged emails with Freescale employees, the terms of

which speak for itself. Freescale otherwise denies the averments in paragraph 34 of the Complaint.

35.    Freescale admits that, pursuant to the terms of a purchase order agreement, Freescale paid EPIC to prepare a non-functional mock-up of the "cell-phone-in-a-package" concept and EPIC delivered a sample of the mock-up and was paid accordingly. Freescale otherwise denies the averments in paragraph 35 of the Complaint.

36.    Freescale admits that, in an effort to convince Freescale to license or acquire its technology, EPIC provided Freescale with certain information. Freescale otherwise is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 36 of the Complaint, and Freescale therefore denies such averments.

37.    Freescale admits that, pursuant to the terms of the Technology Evaluation and Design Development Agreement and purchase order agreements, Freescale paid EPIC to design an operational cell-phone-in-a-package by combining an operational cell phone (including memory, power management, baseband, transceiver and RF front end modules) into one package using what EPIC called its ChipsFirst technology. Freescale also admits that Freescale paid EPIC the agreed fee and, on or about December 2005, EPIC presented the design to Freescale but never actually delivered it. Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 37 of the Complaint concerning EPIC's difficulty in completing the design and EPIC's knowledge of operational issues related to the design, and Freescale therefore denies such averments. Freescale otherwise denies the averments in paragraph 37 of the Complaint.

38.    Freescale admits that, after EPIC presented the cell-phone-in-a-package design to Freescale for the agreed fee, the parties engaged in discussions regarding the possibility of

Freescale buying out EPIC's technology, during which time Freescale further evaluated the technology. Freescale admits that, as part of these discussions, Freescale submitted questions to EPIC concerning scalability and manufacturability of the technology and EPIC provided Freescale with additional information. Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 38 of the Complaint concerning EPIC's bases for providing Freescale with this information, and Freescale therefore denies such averments. Freescale otherwise denies the averments in paragraph 38 of the Complaint.

39.    Freescale admits that, at various times over the last several years, employees of Freescale and Motorola have expressed interest in EPIC's technology. Freescale also admits that the parties entered into purchase order agreements and confidentiality agreements, the terms of which speak for themselves. Freescale otherwise denies the averments in paragraph 39 of the Complaint to the extent the allegations are deemed factual. To the extent paragraph 39 of the Complaint contains legal conclusions, no response is required.

40.    Freescale admits that, on May 4, 2001, Mangrum sent a letter to EPIC with the subject heading "Motorola's Evaluation of EPIC Technology -- Letter of Intent," which attached a proposed statement of work that EPIC was to perform for a fee. Freescale admits that, shortly after sending the letter, Motorola issued a purchase order formally requesting the previously referenced work for an agreed fee. The terms of the letter and purchase orders speak for themselves. Freescale otherwise denies the averments in paragraph 40 of the Complaint.

41.    Freescale admits that Motorola employees exchanged emails with EPIC employees, the terms of which speak for themselves. Freescale otherwise denies the averments in paragraph 41 of the Complaint.

42.    Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 42 of the Complaint concerning EPIC's mental state based on any Mangrum presentation, and Freescale therefore denies such averments. Freescale otherwise denies the averments in paragraph 42 of the Complaint.

43.    Freescale admits that conference calls took place that involved EPIC employees and Motorola employees. Freescale also admits that, in response to EPIC's attempts to license the relevant technology, Motorola at times requested EPIC to provided additional information. Freescale otherwise denies the averments in paragraph 43 of the Complaint.

44.    Freescale admits that Pete Shinyeda was head of Motorola's wireless division in or about March 2003. Freescale also admits that Motorola employees exchanged emails with EPIC employees, the substance of which speaks for itself. Freescale otherwise denies the averments in paragraph 43 of the Complaint.

45.    Freescale admits that Motorola employees exchanged emails with EPIC employees, the substance of which speaks for itself. Freescale otherwise denies the averments in paragraph 43 of the Complaint.

46.    Freescale admits that, in 2003, Mangrum met internally with Motorola's management to try to convince Motorola to license the technology, but Motorola's management was generally not receptive. Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 46 of the Complaint concerning EPIC's mental state of encouragement based on any presentation, and Freescale therefore denies such averments. Freescale otherwise denies the averments in paragraph 46 of the Complaint.

47.    Freescale admits that, despite a number of upper-level management changes at Motorola, in late 2003 Mangrum's interest in EPIC's technology remained high. Freescale

admits that Motorola employees exchanged emails with EPIC employees, the substance of which speaks for itself. Freescale also admits that, pursuant to Mangrum's request, EPIC delivered a mock up of the cell-phone-in-a-package technology to Motorola for a fee in accordance with the terms of a purchase order agreement. Freescale further admits that, with EPIC's consent and with EPIC representative in attendance, Franz Fink (general manager of Motorola's wireless and mobile systems group) used the mock up in a presentation he made at an industry trade show. Freescale otherwise denies the averments in paragraph 47 of the Complaint.

48.     Freescale admits that the parties continued their discussions regarding Freescale's evaluation of the relevant technology, and in October 2004 and March 2005 the parties entered into the so-called Freescale NDA and the Technology Evaluation and Design Development Agreement, respectively. Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 48 of the Complaint concerning EPIC's confidence in the parties' relationship, and Freescale therefore denies such averments. Freescale otherwise denies the averments in paragraph 48 of the Complaint.

49.     Freescale admits that, in or about the first quarter of 2006, following EPIC's delivery of the cell-phone-in-a-package design, Freescale contacted EPIC to discuss a potential technology buy-out of the company and the parties thereafter arranged for a meeting to occur on March 21, 2006. Freescale otherwise denies the averments in paragraph 49 of the Complaint.

50.     Freescale admits that Valerie Hase held the title of Director of Corporate Business Development & Licensing at Freescale. Freescale also admits that Freescale employees exchanged emails with EPIC employees, the substance of which speaks for itself. Freescale otherwise denies the averments in paragraph 50 of the Complaint.

51.     Freescale admits that, over several months in 2006, the parties conducted discussions regarding a potential technology buy-out, but ultimately the parties were unable to agree upon mutually acceptable terms.  Freescale otherwise denies the averments in paragraph 51 of the Complaint.

52.     Freescale admits that, in or about July 2006, Freescale made public statements concerning its RCP technology in connection with Freescale's Technology Forum held in Orlando, Florida.  Freescale admits that, on or about July 25, 2006, Freescale issued a press release entitled "Breakthrough Technology from Freescale Redefines State of the Art for Advanced Semiconductor Packaging," the substance of which speaks for itself.  Freescale otherwise denies the averments in paragraph 50 of the Complaint.

53.     Freescale admits that, on or about July 25, 2006, Freescale's then-Chairman and CEO Michel Mayer gave the keynote address at Freescale's Technology Forum, the substance of which speaks for itself.  Freescale otherwise denies the averments in paragraph 50 of the Complaint.  Freescale otherwise denies the averments in paragraph 53 of the Complaint.

54.     Freescale admits that, in order to demonstrate the reduced size of future chip technology at the July 2006 Freescale Technology Forum, Freescale used a generic, non-confidential photograph related to work that Freescale paid EPIC to perform in 2001.  Freescale admits that the non-confidential photograph showed a small portion of the Whitecap sample designed by EPIC, which Freescale owns and has the right to use pursuant to the terms and conditions of a valid purchase order agreement.  Freescale otherwise denies the averments in paragraph 54 of the Complaint.

55.    Freescale admits that, on or about July 31, 2006, an article was published at www.eetimes.com relating to Freescale's RCP program, the substance of which speaks for itself. Freescale otherwise denies the averments in paragraph 55 of the Complaint.

56.    Freescale admits that, in or about September 2006, Mangrum prepared a PowerPoint presentation entitled "Freescale's Packaging Technologies for Mobile Platforms." Freescale admits that the presentation included a photograph of a mock up Freescale prepared of its own RCP technology, comparing its size to that of a postage stamp.  Freescale admits that, although no portion of the mock up EPIC prepared appeared in the presentation, the photograph of Freescale's RCP mock up was pasted next to a nonproprietary, non-confidential graphic of a postage stamp that came from a document provided by EPIC.  Freescale otherwise denies the averments in paragraph 56 of the Complaint.

57.    Freescale admits that the structures disclosed on Freescale's website of Freescale's RCP technology shows that it uses the MultiChip Model approach.  Freescale admits that EPIC also uses the MultiChip Model approach.  Freescale also admits that certain members of the RCP team were, on two occasions, asked to evaluate certain aspects of EPIC's technology to assist in determining whether Freescale was interested in discussing the possibility of licensing or acquiring the technology to supplement its own RCP program.  Freescale further admits that, at one point there was information on Freescale's website that described one or more of these same Freescale employees as RCP "Innovators" (including Owen Fay, George Leal and Robert Wenzel), described Beth Keser as "Technology Development Team Leader" and Marc Mangrum as the RCP "Concept Originator."   Freescale otherwise denies the averments in paragraph 57 of the Complaint.

58.    Freescale admits that, on or about March 5, 2007, Freescale issued a press release related to its RCP program, the substance of which speaks for itself.  Freescale otherwise denies the averments in paragraph 58 of the Complaint.

59.    Freescale admits that, on or about April 1, 2007, an article by Keser was published in *Semiconductor International* magazine, the substance of which speaks for itself. Freescale also admits that Keser met with EPIC on three occasions and sent technical questions to EPIC in 2006 as part of Freescale's evaluation effort related to the then-ongoing discussions of a potential technology buy-out of EPIC.  Freescale otherwise denies the averments in paragraph 59 of the Complaint.

60.    Freescale admits that, in or about 2007, Freescale expressed interest in supplementing its RCP technology by obtaining an exclusive license to EPIC's technology, but Freescale ultimately decided not to do so.  Freescale admits that, notwithstanding its hope that its RCP technology could eventually become a significant semiconductor packaging technology and an industry wide standard, the technology has failed to garner the support needed to make this happen.  Freescale otherwise denies the averments in paragraph 60 of the Complaint.

## STATEMENT OF CLAIMS

### Count I
### Infringement of the '193 Patent

61.    Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 61 of the Complaint.

62.    Freescale admits that, on November 24, 1998, the United States Patent Trademark Office issued the '193 Patent, entitled "Single Chip Modules, Repairable Multichip Modules, and Methods of Fabrication Thereof."  To the extent the other allegations in paragraph 62 of the Complaint are deemed factual, Freescale is without knowledge or information sufficient to form

a belief as to the truth of the averments set forth in paragraph 62 of the Complaint, and Freescale therefore denies such averments. To the extent paragraph 62 of the Complaint contains legal conclusions, no response is required.

63.     Paragraph 63 of the Complaint contains legal conclusions, to which no response is required. Freescale otherwise denies the averments in paragraph 63 of the Complaint.

64.     Paragraph 64 of the Complaint contains legal conclusions, to which no response is required. Freescale otherwise denies the averments in paragraph 64 of the Complaint.

65.     Paragraph 65 of the Complaint contains legal conclusions, to which no response is required. Freescale otherwise denies the averments in paragraph 65 of the Complaint.

## Count II
## Breach of Contracts

66.     Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 66 of the Complaint.

67.     Freescale admits that, in connection with the parties' disclosures of information the parties entered into purchase order agreements, as well as a several written confidentiality agreements. Freescale otherwise denies the allegations in paragraph 13 of the Complaint to the extent the allegations are deemed factual. To the extent paragraph 13 of the Complaint contains legal conclusions, no response is required.

68.     Freescale admits that the parties entered into purchase order agreements and confidentiality agreements, the terms of which speak for themselves. To the extent paragraph 62 of the Complaint contains legal conclusions, no response is required.

69.     Paragraph 69 of the Complaint contains legal conclusions, to which no response is required. Freescale otherwise denies the averments in paragraph 69 of the Complaint.

70.    Paragraph 70 of the Complaint contains legal conclusions, to which no response is required. Freescale otherwise denies the averments in paragraph 70 of the Complaint.

71.    Paragraph 71 of the Complaint contains legal conclusions, to which no response is required.

## Count III
## Promissory Estoppel

72.    Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 72 of the Complaint.

73.    Freescale admits that it knew it had only certain license rights from EPIC with respect to EPIC's technology and made written and oral communications consistent with that knowledge, the substance of which speaks for itself. Freescale also admits that, in an attempt to convince Freescale that EPIC's technology could add value to Freescale's RCP program, EPIC provided Freescale with certain information. Freescale further admits that the parties entered into purchase order agreements and confidentiality agreements, the terms of which speak for themselves. Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 73 of the Complaint concerning EPIC's mental state and purported reliance, and Freescale therefore denies such averments. Freescale otherwise denies the allegations in paragraph 73 of the Complaint to the extent the allegations are deemed factual. To the extent paragraph 73 of the Complaint contains legal conclusions, no response is required.

74.    Paragraph 74 of the Complaint contains legal conclusions, to which no response is required. Freescale otherwise denies the averments in paragraph 74 of the Complaint.

75.    Paragraph 75 of the Complaint contains legal conclusions, to which no response is required. Freescale otherwise denies the averments in paragraph 75 of the Complaint.

## Count IV
## Unjust Enrichment

76.     Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 76 of the Complaint.

77.     Paragraph 77 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 77 of the Complaint.

78.     Paragraph 78 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 77 of the Complaint.

79.     Paragraph 79 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 79 of the Complaint.

80.     Paragraph 80 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 80 of the Complaint.

81.     Paragraph 81 of the Complaint contains legal conclusions, to which no response is required.

## Count V
## Trade Secret Misappropriation/Violation of G.L. c.93 §42

82.     Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 82 of the Complaint.

83.     Paragraph 83 of the Complaint contains legal conclusions, to which no response is required.

84.     Freescale denies the averments in Paragraph 84 suggesting that much of the information relating to EPIC's publicly patented ChipsFirst technology is not accessible to competitors through proper means.  Freescale further denies the averments in paragraph 84 of the Complaint suggesting that EPIC developed the cell-phone-in-a-package concept.  To the extent the other allegations in paragraph 84 of the Complaint are deemed factual, Freescale is without

knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 84 of the Complaint, and Freescale therefore denies such averments.  To the extent paragraph 84 of the Complaint contains legal conclusions, no response is required.

85.     Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 85 of the Complaint regarding all of EPIC's efforts to protect its information, and Freescale therefore denies such averments.  Freescale admits that, in addition to purchase order agreements, EPIC has entered into written confidentiality agreements with Freescale, the terms of which speak for themselves.  Freescale is further without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 85 of the Complaint regarding EPIC's motivations or reasons for providing information to Freescale, and Freescale therefore denies such averments.  To the extent the other allegations in paragraph 85 of the Complaint are deemed factual, Freescale denies such averments.  To the extent paragraph 85 of the Complaint contains legal conclusions, no response is required.

86.     Paragraph 86 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 86 of the Complaint.

87.     Paragraph 87 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 87 of the Complaint.

## Count VI
### False Description and False Designation of Origin

88.     Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 88 of the Complaint.

89.     Paragraph 89 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 89 of the Complaint.

90.     Paragraph 90 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 90 of the Complaint.

91.     Paragraph 91 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 91 of the Complaint.

92.     Paragraph 92 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 92 of the Complaint.

**Count VII**
**<u>Conversion</u>**

93.     Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 93 of the Complaint.

94.     Freescale denies the averments in paragraph 94 suggesting that EPIC is the owner of the cell-phone-in-a-package product concept.  To the extent the other averments in paragraph 94 are deemed to be factual, Freescale is without knowledge or information sufficient to form a belief as to the truth of the averments set forth in paragraph 94 of the Complaint, and Freescale therefore denies such averments. To the extent paragraph 94 of the Complaint is deemed to contain legal conclusions, no response is required.

95.     Paragraph 95 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 95 of the Complaint.

96.     Paragraph 96 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 96 of the Complaint.

97.     Paragraph 97 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 97 of the Complaint.

## Count VIII
## <u>Breach Of Implied Covenant Of Good Faith And Fair Dealing</u>

98.    Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 98 of the Complaint.

99.    Paragraph 99 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 99 of the Complaint.

100.    Paragraph 100 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 100 of the Complaint.

101.    Paragraph 101 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 101 of the Complaint.

## Count IX
## <u>Unfair Trade Practices/Violation of G.L. c.93A</u>

102.    Freescale restates its preceding responses to each allegation in the Complaint as its response to paragraph 102 of the Complaint.

103.    Paragraph 103 of the Complaint contains legal conclusions, to which no response is required.

104.    Paragraph 104 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 104 of the Complaint.

105.    Paragraph 105 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 105 of the Complaint.

106.    Paragraph 106 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 106 of the Complaint.

107.    Paragraph 107 of the Complaint contains legal conclusions, to which no response is required.  Freescale otherwise denies the averments in paragraph 107 of the Complaint.

## DEFENDANT FREESCALE'S AFFIRMATIVE DEFENSES AND DEFENSES

108.    As separate affirmative defenses and defenses to the claims and allegations contained in the Complaint, Freescale, without admitting or acknowledging that it bears the burden of proof as to any defense, asserts the following affirmative defenses and defenses, while reserving its right to further supplementation:

### FIRST DEFENSE

### (Improper Venue)

109.    EPIC's claims are subject to dismissal or transfer on the basis of improper venue. Pursuant to the purchase order agreements between the parties, venue is proper in Travis County, Texas and the parties are only permitted to initiate litigation for non-intellectual property claims after submitting the disputes to non-binding mediation.

### SECOND DEFENSE

### (Failure to State a Claim)

110.    EPIC's Complaint fails to state a claim upon which relief can be granted under the applicable law.

### THIRD DEFENSE

### (Indispensable Parties)

111.    Those parties retaining rights in the '193 patent are indispensable parties who must be joined.

### FOURTH DEFENSE

### (Non-Infringement)

112.    Freescale has not willfully or otherwise infringed, contributed to the infringement of, or actively induced others to infringe any valid and enforceable claim of the '193 patent,

either directly or indirectly, either literally or under the doctrine of equivalents. Freescale also does not willfully or otherwise infringe, contribute to the infringement of, or actively induce others to infringe any valid and enforceable claim of the '193 patent, either directly or indirectly, either literally or under the doctrine of equivalents.

## FIFTH DEFENSE

### (Invalidity)

113.    The claims of the '193 patent are invalid and unenforceable for failure to comply with one or more of the requirements of Title 35 of the United States Code, including, without limitation, 35 U.S.C. §§ 101, 102, 103, and 112.

## SIXTH DEFENSE

### (Dedication to the Public)

114.    EPIC's claims are barred to the extent that it has dedicated to the public systems, methods, and products disclosed in the '193 patent but not literally claimed therein.

## SEVENTH DEFENSE

### (Marking)

115.    EPIC is prohibited from recovering damages for activities alleged to have occurred before it complied with 35 U.S.C. § 287.

## EIGHTH DEFENSE

### (Prosecution Estoppel)

116.    By reason of the proceedings in the United States Patent and Trademark Office (including any other applicable regulatory authorities) during prosecution of the applications that resulted in the issuance of the '193 Patent, and the admissions and representations made therein by and on behalf of the applicants in order to induce the grant of the '193 Patent, EPIC is

estopped from asserting any construction of the claims of the patent which would cover or include any of the purported acts of infringement of which EPIC complains.

### NINTH DEFENSE

### (License)

117.    Freescale is licensed, either expressly or impliedly, to use the '193 patent and related EPIC technology and information.

### TENTH DEFENSE

### (Title)

118.    Freescale owns title to certain of the technology, materials and information that form the basis for EPIC's Complaint, contrary to EPIC's claims of ownership.

### ELEVENTH DEFENSE

### (Payment)

119.    Payment has been made to EPIC, satisfying any and all amounts owed.

### TWELFTH DEFENSE

### (Failure of Consideration)

120.    EPIC's breach of contracts claims are barred for failure of consideration.

### THIRTEENTH DEFENSE

### (No Confidentiality Requirement)

121.    EPIC and Freescale have agreed that certain of the technology, materials and information serving as the basis for EPIC's complaint would not be deemed secret or confidential.

## FOURTEENTH DEFENSE

### (Events Did Not Occur Primary or Substantially in Massachusetts)

122.    With regard to Count IX: Unfair Trade Practices under Mass. G.L. ch 93A, section 11 of Mass. G.L. ch 93A states: "No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth [of Massachusetts]." Yet, it is clear from the face of the Complaint that EPIC is alleging that the alleged wrongdoing occurred primarily and substantially outside the Commonwealth of Massachusetts.

## FIFTEENTH DEFENSE

### (Good Faith)

123.    Freescale has conducted itself at all times in good faith.

## SIXTEENTH DEFENSE

### (No Demand for Return of Personal Property)

124.    EPIC's conversion claim is barred given EPIC's position that Freescale purportedly exercised control over information, and not personal property as required for conversion, and given that EPIC alleges that Freescale legitimately obtained access to the complained-of information but does not allege that it has demanded the return of such information and Freescale has refused.

## SEVENTEENTH DEFENSE

### (Equitable Estoppel)

125.    EPIC is estopped by its misleading, deceptive, and unlawful conduct from asserting some or all of its claims, including, but not limited to, its claim that Freescale's products or methods infringe any valid claim of the '193 patent.

## EIGHTEENTH DEFENSE

### (Laches)

126.    Some or all of EPIC's claims are barred or limited by the doctrine of laches.

## NINETEENTH DEFENSE

### (Waiver)

127.    EPIC waived some or all of the rights and claims it seeks to enforce in this suit.

## TWENTIETH DEFENSE

### (Acquiescence)

128.    Some or all of EPIC's claims are barred due to EPIC's acquiescence.

## TWENTY-FIRST DEFENSE

### (Statute of Limitations)

129.    Some or all of EPIC's claims are barred by the applicable statute of limitations.

## TWENTY-SECOND DEFENSE

### (Failure to Mitigate)

130.    EPIC has failed to mitigate its damages.

## TWENTY-THIRD DEFENSE

### (Limitation of Liability)

131.    Section 7 of the Technology Evaluation and Design Development Agreement limits Freescale's liability, stating: "IN NO EVENT WILL EITHER PARTY BE LIABLE, WHETHER IN CONTRACT, TORT, OR OTHERWISE, FOR ANY INCIDENTAL, SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR ANY LOSS OF USE, LOSS OF TIME, INCONVENIENCE, COMMERCIAL LOSS, OR LOST PROFITS, SAVINGS, OR REVENUES, TO THE FULL EXTENT SUCH MAY BE DISCLAIMED BY LAW.  THE FOREGOING LIMITATION DOES NOT LIMIT THE PARTIES' LIABILITY FOR BREACH OF CONFIDENTIALITY OBLIGATIONS EXPRESSLY SET FORTH IN SECTION 8."

132.    Section 5 of Freescale Semiconductor, Inc. Procurement Terms and Conditions limits Freescale's liability, stating: "FREESCALE'S TOTAL LIABILITY FOR DAMAGES UNDER THIS ORDER WILL NOT EXCEED THE PRICE ALLOCABLE TO THE GOODS OR SERVICES GIVING RISE TO THE CLAIM, AND IN NO EVENT WILL FREESCALE BE LIABLE, WHETHER IN CONTRACT, TORT, OR OTHERWISE, FOR ANY INCIDENTAL, SPECIAL, INDIRECT, CONSEQUENTIAL OR PUNITIVE DAMAGES, INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR ANY LOSS OF USE, LOSS OF TIME, INCONVENIENCE, COMMERCIAL LOSS, OR LOST PROFITS, SAVINGS OR REVENUES, TO THE FULL EXTENT THEY MAY BE DISCLAIMED BY LAW."

## TWENTY-FOURTH DEFENSE

### (Time Limitation on Damages)

133.    EPIC's claims for relief and prayer for damages are limited by 35 U.S.C. § 286, which prohibits recovery for any infringement committed more than six years before the filing of the complaint.

## TWENTY-FIFTH DEFENSE

### (Enhanced Damages)

134.    EPIC has failed to meet the requirements for enhanced damages.

## TWENTY-SIXTH DEFENSE

### (Attorney's Fees)

135.    Freescale has not engaged in any conduct that entitles EPIC to attorney's fees.

## TWENTY-SEVENTH DEFENSE

### (Equitable Relief)

136.    EPIC's claims for equitable relief are barred because it has adequate remedies at law.

## TWENTY-EIGHTH DEFENSE

### (Unclean Hands)

137.    The doctrine of unclean hands bars EPIC's claim for equitable relief, including but not limited to, EPIC's claim for injunctive relief.

## TWENTY-NINTH DEFENSE

### (Injunctive Relief)

138.    EPIC's claims for injunctive relief are barred because it has failed to meet the requirements for injunctive relief.

WHEREFORE Freescale prays that the Court enter judgment that EPIC take nothing and award Freescale such other and further relief as the Court deems just and proper at law or in equity.

DATED:  August 18, 2008

Respectfully submitted,

**McKOOL SMITH, P.C.**

/s/ Steven Callahan
Robert Elkin, *Pro Hac Vice*
Steven Callahan (BBO # 661486)
**Of McKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas  75201
Telephone:  (214) 978-4000
Facsimile:  (214) 978-4044
scallahan@mckoolsmith.com
relkin@mckoolsmith.com

Judith Pace, *Pro Hac Vice*
**Of McKOOL SMITH, P.C.**
300 W. 6th Street, Suite 1700
Austin, Texas  78701
Telephone:  (512) 692-8700
Facsimile:   (512) 692-8744
jpace@mckoolsmith.com

**ATTORNEYS FOR DEFENDANT
FREESCALE SEMICONDUCTOR, INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule 5.4 on August 18, 2008.  As such, this document was served on all counsel who are registered ECF users.  Local Rule 5.4(C).  The foregoing document has also been served on counsel for Epic Technologies Inc. by e-mail on August 18, 2008.

/s/ Steven Callahan
Steven Callahan